**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JANE DOE T.G., | |
| *Plaintiff*, | Case No.: 1:25-cv-09339 |
| v. | |
| UHS OF HARTGROVE, INC., d/b/a Hartgrove Behavioral Health System; UNIVERSAL HEALTH SERVICES, INC., and UHS OF DELAWARE, INC., | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| *Defendants*. | |

Plaintiff Jane Doe T.G. brings this action against UHS of Hartgrove, Inc., d/b/a Hartgrove Behavioral Health System ("Hartgrove" or "Hartgrove Hospital"), Universal Health Services, Inc. ("UHS, Inc"), and UHS of Delaware, Inc. ("UHS-D", and collectively, "Defendants"). Plaintiff alleges the following based on personal knowledge as to her own facts and upon information and belief and the investigation of counsel as to all other matters.

## INTRODUCTION

1.      Each year, Hartgrove, UHS, Inc., and UHS-D, one of the largest youth mental health networks in the country, assumes responsibility for protecting thousands of our country's most vulnerable members, particularly children who have experienced traumatic events and serious mental health conditions.

2.      Hartgrove describes itself as a "place for hope and healing," but that has not been the case for many patients. Nonetheless, UHS, Inc. and its subsidiaries, including Hartgrove, have advertised themselves to the public, governmental agencies and non-profits, and to the parents and

1

guardians of minor patients or prospective patients in Chicago and surrounding areas, as a safe youth residential treatment facility for children, staffed with trustworthy medical professionals.

3.     Instead of fulfilling its critical responsibility to protect these vulnerable youth, Hartgrove Behavioral System exposed them to predators and abusers. Hartgrove failed to enact safety measures and other policies to protect children; failed to adequately screen, hire, train, and supervise staff; and failed to fulfill its duties under state and federal law. Dozens of patients have alleged that they experienced assault and sexual abuse at Hartgrove. Federal and state-level investigations into Hartgrove have substantiated numerous stories of patient sexual abuse and neglect.

4.     As a result of Defendants' misconduct, children in UHS facilities across the country, and across the state of Illinois, have been sexually, physically, or emotionally abused—often by staff.

5.     Plaintiff Jane Doe T.G. was repeatedly sexually assaulted, coerced, and abused by staff members at Hartgrove Hospital during three separate visits between 2010–2011. The sexual abuse was severe and included among other abuse, being forced to touch another, exposed student inappropriately in an in-patient classroom and being forced to kiss other patients. When Plaintiff refused advances by male staff members, she was threatened with repercussions, including extending her hospitalization.

6.     Plaintiff is bringing this lawsuit to hold Defendants accountable for the harm they caused her and to prevent this devastating abuse from happening to any other child under their care.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff alleges actions arising under the laws of the United States, including 20 U.S.C. § 1681 and 34 U.S.C. § 20341.

8.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, because upon information and belief, Plaintiff and Defendant reside in different states, and the amount in controversy exceeds $75,000.

9.     This Court has personal jurisdiction over Defendants because Defendants UHS, Inc. and UHS-D have substantial and continuous connections with the state of Illinois. Defendants UHS, Inc. and UHS-D own, operate, manage, and control Defendant Hartgrove and six other behavioral health facilities in Illinois. As part of their business contacts with the states, they owned, operated, managed, promoted, and controlled the services provided by these behavioral health facilities and profit substantially from these activities. Defendant Hartgrove's principal place of business is also located in Cook County, Illinois.

10.     Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because, *inter alia*, a substantial part of the events or omissions giving rise to the claim occurred in the District.

## THE PARTIES

I.     **Plaintiff**

11.     Plaintiff Jane Doe T.G. is a citizen of the State of California.

12.     Plaintiff was in an inpatient ward at Hartgrove on three separate occasions between 2010 and 2011, when she was approximately 14 to 16 years old.

13.     Each hospital stay lasted approximately one month, and Plaintiff received educational services while in Hartgrove's care.

II.     **Defendants**

   A.  **Hartgrove Behavioral Health System**

14.     Defendant Hartgrove is a residential treatment facility that provides services to children (between 6 and 12 years old) and adolescents (between 12 and 18 years old). The facility also provides services to adults with behavioral and emotional problems.

15.     At all relevant times, Hartgrove operated programs that provided mental health services to children and adolescents. These programs treat minors with behavioral and emotional disorders, depression, attention deficit hyperactivity disorder, as well as those who exhibit symptoms of physical and sexual abuse, who suffer from suicidal ideation, and who struggle with substance abuse problems.

16.     Hartgrove is a subsidiary of Defendant Universal Health Services, Inc.; however, Hartgrove oversees the day-to-day operations of the centers associated with the Hartgrove Behavioral Health System.

17.     Hartgrove's registered agent is the Illinois Corporation Service Company located at 801 Adlai Stevenson Drive, Springfield, Illinois.

18.     Hartgrove's principal business address is 5730 West Roosevelt Road, Chicago, IL 60644.

19.     Hartgrove's day-to-day activities are overseen by Chief Executive Officer Steven Airhart and a local leadership team consisting of medical officers, clinical directors, and program directors, among others.

20.     Hartgrove's President, Matt Peterson, and Secretary, Matthew D. Klein, have offices at UHS Inc.'s corporate headquarters in King of Prussia, PA, where they direct Hartgrove's employees and agents.

21.     At all relevant times, executives and members of the leadership team at Hartgrove were agents, servants, and employees of UHS, Inc., UHS-D, or a combination thereof.

22.     At all relevant times, Hartgrove followed and still follows policies and procedures created, controlled, and or enforced by UHS, Inc. and UHS-D. One such policy is the requirement to file "unusual incident reports" with UHS, Inc. when sexual abuse is suspected or witnessed.

23.     Hartgrove employees consider themselves to be employees of UHS and publicly portray themselves as such. For example, Hartgrove's CEO, Steven Airhart, identifies his employer on LinkedIn as "Hartgrove Behavioral Health System/UHS."

24.     Hartgrove recently advertised plans to expand its operations by substantially increasing occupancy capacity. The new construction project proposes to add 48 Acute Mental Illness (AMI) beds to the existing 160-bed units, resulting in a total of 208 AMI beds.[1]

**B.  UHS Delaware**

25.     UHS Delaware (UHS-D) is the management subsidiary of Universal Health Services, Inc.

26.     UHS-D is primarily responsible for managing the operations and activities of other related companies within a larger corporate structure, under the direction of UHS, Inc.

27.     UHS, Inc. is a "holding company that operates through its subsidiaries," meaning that healthcare and management operations are conducted by subsidiaries.

28.     Upon information and belief, UHS-D's registered agent in Illinois is Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois.

---

[1] *Letter: Completeness Requirements Met, Health Facilities Planning Act*, State of Illinois Health Facilities and Services Review Board (June 11, 2024), https://hfsrb.illinois.gov/content/dam/soi/en/web/hfsrb/projects/projectdocuments/2024/24-019-hartgrove-behavioral-health-system/24-019%20Hartgrove%20Behavioral%20Hospital%20complete.pdf (last visited Aug. 5, 2025.

**C. UHS, Inc.**

29. Defendant UHS, Inc. is and has been a public for-profit Delaware corporation with its principal office in King of Prussia, Pennsylvania. UHS, Inc. owns, operates, manages, and controls behavioral health facilities and acute care hospitals throughout the United States, with many of these facilities located in Illinois.

30. UHS, Inc. currently owns seven behavioral health facilities in Illinois. Most are located in Cook County, Illinois.

31. UHS, Inc. operates through several subsidiaries, including but not limited to UHS-D, UHS Children Services, Inc., UHS Outpatient IL, LLC, Thousand Branches Business Support Services, LLC, UHS Outpatient LLC, all of which collectively refer to themselves as "UHS." All references to "UHS" therefore refer to UHS, Inc. and its subsidiary and related corporate entities, including but not limited to Hartgrove Behavioral Health System and UHS-D.

32. Upon information and belief, UHS, Inc., Hartgrove, and UHS-D have been responsible for setting and enforcing all policies and procedures governing patient safety and treatment at UHS facilities, including Hartgrove, at all relevant times.

33. UHS' policy is to acquire inpatient behavioral facilities and run them in line with UHS systems, policies, and procedures.

34. At all relevant times, these subsidiaries operated as an extension of UHS, and internally, UHS treats them as indistinguishable from itself in corporate records and statements. For instance, in reports filed by the SEC, it defines the terms "we," "our," "UHS," and the "Company" to refer to both UHS "and its subsidiaries." UHS' "principal business" is owning and operating behavioral healthcare facilities through its subsidiaries.

35.     Upon information and belief, UHS, Inc., Hartgrove, and UHS-D or some combination of the above, have been responsible for hiring, supervision, and disciplinary decisions concerning employees at Hartgrove.

36.     UHS Inc. and Hartgrove regularly receive state and federal funding for their activities. A significant portion of UHS' revenues "are derived from federal and state government programs including the Medicare and Medicaid programs." 72.4% of Hartgrove's inpatients and 82% of Hartgrove's outpatients receive Medicaid.[2]

37.     UHS Inc. and Hartgrove also receive state and federal special education funding via school district reimbursements in Illinois when school districts refer children to Hartgrove.[3]

38.     According to UHS filings with the SEC in April 2011, a substantial portion of UHS' revenue comes from third-party payors like Medicare and Medicaid. UHS reported that "collection of receivables by third-party payors" is "our primary source of cash and is critical to our operating performance."

## FACTUAL ALLEGATIONS

39.     As "one of the largest" providers of hospital and healthcare services with "approximately 99,300 employees," UHS Inc. provides mental health care support to thousands of Americans via its 331 Behavioral Health Inpatient Facilities.[4] Hartgrove is one of 10 Acute Mental Inpatient (AMI) facilities in the area and provides 29% of all AMI patient days.[5] Parents send their

---

[2]Chicago Plan Commission: Department of Planning and Development (Apr. 18, 2024) https://www.chicago.gov/content/dam/city/depts/zlup/Planning_and_Policy/Agendas/cpc_materials/04_2 024/24-0416_FinalPresentation_5730Roosevelt.pdf (last visited Aug. 5, 2025).
[3] *Home/hospital instructions for students*, Illinois State Board of Education Center for Safe and Healthy Climate Wellness Department, https://www.isbe.net/Documents/Home-Hospital_QA.pdf (last visited July 25, 2025).
[4]Universal Health Services, https://uhs.com/ (last visited July 25, 2025)
[5]Chicago Plan Commission: Department of Planning and Development (Apr. 18, 2024), https://www.chicago.gov/content/dam/city/depts/zlup/Planning_and_Policy/Agendas/cpc_materials/04_2 024/24-0416_FinalPresentation_5730Roosevelt.pdf (last visited Aug. 5, 2025).

children to UHS facilities to receive therapeutic, urgent mental health services, including support for trauma, behavioral health disorders, depression, and substance abuse based upon their reach and expertise.

40.     Hartgrove regularly advertises its ability to provide "Trauma-Informed Care," suggesting that it is "currently the only hospital" to implement this type of trauma-focused individual therapy services.[6] This program provides screening and assessment services, trauma-sensitive group services, and trauma-focused individual therapy services.

41.     Hartgrove also emphasizes its ability to provide "effective" and "evidence-based" inpatient psychiatric treatment to children and adolescents. Educational services are provided through Hartgrove Academy's educational programs.[7]

42.     UHS describes itself as "[o]ne of the nation's largest and most respected hospital companies"[8] and advertises its ability to "provide compassionate care to [its] patients and their loved ones."[9] UHS states that it is "committed to doing its part to improve mental healthcare in communities across the U.S. and to advance suicide prevention at both the national and local levels."

43.     UHS also markets its hospitals as "safe place[s]" for healing and recovery.[10]

---

[6] *Trauma Program*, Hartgrove Hospital, https://hartgrovehospital.com/our-programs/trauma-program/ (last visited July 25, 2025)

[7] *Inpatient Services,* Hartgrove Hospital, https://hartgrovehospital.com/our-programs/inpatient-services/ (last visited July 25, 2025)

[8] Universal Health Services, https://uhs.com/ (last visited Aug. 6, 2025).

[9] *Universal Health Services (UHS) Receives 2024 Press Ganey Human Experience Guardian of Excellence Award*, Universal Health Services (Jan. 7, 2025), https://uhs.com/news/universal-health-services-receives-2024-press-ganey-human-experience-guardian-excellence-award/ (last visited Aug. 6, 2025).

[10] *Voices of Hope – Delivering Superior Quality Patient Care*, Universal Health Services (March 6, 2019), https://uhs.com/news/voices-of-hope-delivering-superior-quality-patient-care/#:~:text=A%20safe%20place%20for%20me,my%20diagnosis:%20bipolar%20disorder.%E2%80%9D D (last visited Aug. 5, 2025).

44.     Hartgrove describes itself as a "leading 160-bed psychiatric hospital dedicated to providing quality behavioral health services for a diverse population of children, adolescents, and adults," as well as "a leader in behavioral health in the Chicago area."[11]

45.     Hartgrove also holds itself out as providing a "compassionate and therapeutic environment" and "offering a continuum of specialty programs. . . ."[12]

46.     Parents, such as Plaintiff's mother, in consultation with their children's schools, send their children to Hartgrove because it holds itself out as an effective inpatient mental health treatment program. Hartgrove provides many services that are allegedly "evidence-based" and "trauma-informed."[13]

47.     Yet the experience for many patients has been anything but therapeutic. More than 100 former patients have filed lawsuits against UHS for alleged abuse, with many patients reporting that staff routinely forced patients to perform sexual acts on other minor patients and that many reported their abuse at the time. Some of these complaints date back to the early 1990s. In response, Hartgrove Hospital has emphasized: "The safety of all patients is of paramount importance to Hartgrove Hospital. . . ."[14]

48.     Yet abuse continues to occur. Decades of police reports corroborate Defendants' knowledge of and attempts to sweep recurring sexual abuse and misconduct at Hartgrove under the rug, a problem that was also present at other UHS facilities.

---

[11] *Hartgrove Behavioral Health System*, LinkedIn, https://www.linkedin.com/company/hartgrove-hospital (last visited Aug. 6, 2025).

[12] *Id*.

[13] *Trauma Program*, Hartgrove Hospital, https://hartgrovehospital.com/our-programs/trauma-program/ (last visited July 25, 2025).

[14] *More than 100 former patients file major lawsuit against Universal Health Services for alleged abuse*, Fox 32 News (Dec. 12, 2024, 3:02 CST), https://www.fox32chicago.com/news/illinois-lawsuit-universal-health-services (last visited July 25, 2025).

49.     Chicago Police Department (CPD) records indicate that Defendants were aware of ongoing patterns of abuse in their facility. Some of these reports include:

    a.  A minor female patient reporting sexual abuse by another male patient at Hartgrove on July 30, 2007.

    b.  A minor female patient reporting that she was drugged and raped by a male staff member at Hartgrove on November 19, 2010.

    c.  A minor male patient reporting that a male hospital attendant at Hartgrove molested him in his room while he slept on December 21, 2010.

    d.  A minor male patient reporting sexual abuse by his therapist at Hartgrove on September 23, 2011.

    e.  A female patient was sexually assaulted by a male patient on video during a group therapy session in 2017.

    f.  On October 18, 2017, a female patient reported that a nighttime employee entered her room and began to sexually assault her until her roommate cried out and caused him to leave. The Chicago Police Department spoke with the Hartgrove Risk Manager who refused to identify who the offending employee was and simply stated he had been suspended.

50.     At least 50 similar incidents have been reported to the Chicago Police Department between 2007 and July 2024.

51.     Upon information and belief, the above police reports have never resulted in a meaningful review or change in the policies and procedures that fostered a culture of child abuse at Hartgrove or other UHS facilities.

52. Hartgrove's culture of indifference to the safety and well-being of its patients has caused patients such as Plaintiff to suffer. This culture persists, as many patients or their family members have publicly posted about abuse, neglect, and other serious problems they experienced or witnessed at Hartgrove on online forums, such as Google and YELP reviews.

53. At all relevant times, these public postings provided notice to Hartgrove and UHS of the serious and systemic abuse at Hartgrove.

    a. <u>Internet Review Example 1</u>: It's a bad place for anyone and everyone the food is bad and they have a teacher who comes in she's really mean and the guys there that are staff will look at you and try to go in your room and look at you inappropriately I'm a girl and I'm 15 year's old I just got out of there it's a bad place don't send your kid there just because of there anger or running away it's not worth it nothing changed and I'm so upset that my dad did this to me and it makes me feel not wanted. I hate it there[15]

    b. <u>Internet Review Example 2</u>: I got hospitalized here, and I ended up worse than when I went inside. I was put in the teen area when I was 12, and I almost got jumped by way older girls. It's honestly the worst place. I don't recommend it. I also forgot to add that some kids were violent there and wanted to hurt me a lot of times. It honestly felt like I had no privacy or safety, especially since my roommate would open the bathroom curtains when I was using the bathroom.[16]

    c. <u>Internet Review Example 3</u>: horrible horrible place. staff would get in patients faces and cuss them out. staff would get physical with patients. if you bring your own

---

[15] https://www.top-rated.online/cities/Chicago/place/p/3982520/Hartgrove+Hospital (last visited Aug. 6, 2025).

[16] https://maps.app.goo.gl/2iQf8Q8jikkTjUtW6 (last visited Aug. 6, 2025).

items, expect to not get them back. you also don't get a pillow until like your last day there. there are so many fights. the staff let people make fun of each other and staff make fun of patients with other patients. horrible treatment. you learn nothing. not helpful at all.[17]

d.  <u>Internet Review Example 4</u>: DO NOT BRING YOUR CHILDREN TO THIS HOSPITAL!!! This is a horrible horrible place . My child was brought in & participated in their PHP program. After 2 days I no longer brought him in due to a male staff "punishing" him by making him get on the floor & opening his legs in a split until it hurt him . I was not told of the incident. My son had to tell me & when I called they were rude & did not want to hear it . When asked to speak to a supervisor they took my name & number but never called . Stay away from this hospital!![18]

e.  <u>Internet Review Example 5</u>: My brother was recently at this hospital and he told me how there was a male staff member on 2N that was disrespectful towards him and other male patients specifically. I was more shocked when he told me that this guy seemed to be checking out the female patients/staff and would spend more time watching certain female patients. Someone like this should not be working in a mental health hospital. It just sounds like they let anyone work here. Whoever that guy was needs to be investigated because I wonder how many people he has made uncomfortable if my brother felt that way[19]

---

[17] https://maps.app.goo.gl/EHjiJVXUDNMvZxFq5 (last visited Aug. 6, 2025).
[18] https://maps.app.goo.gl/4StkCdhyXGfUoj537 (last visited Aug. 6, 2025).
[19] https://maps.app.goo.gl/2iQf8Q8jikkTjUtW6 (last visited Aug. 6, 2025).

54.     In addition to complaints by patients, parents, and/or guardians, conditions at Hartgrove were so bad that Hartgrove (and UHS as a whole) became the subject of several federal, state, and local investigations, including in 2010, when state officials asked healthcare experts to intervene and investigate the facility.

55.     In June 2010, the University of Illinois at Chicago ("UIC")'s Mental Health Policy Team was tasked with conducting a quality-of-care review of Hartgrove on behalf of the Illinois Department of Children and Family Services ("DCFS"). The report summarizing UIC's findings contained several alarming findings based upon a review of 12,000 pages of documents from the hospital and extensive telephone interviews:

    a.    UHS Hartgrove subjected minor patients to "a consistent pattern of unacceptable risks of harm, substandard quality of care, poor clinical judgment and discharge planning, and questionable clinical management practices by hospital and corporate officials at all levels of the organization."

    b.    The report found that the UHS system generally demonstrated a pattern of quality of care issues, harm to patients, or major healthcare fraud charges in dozens of states, including Illinois.

    c.    Hartgrove exposed patients to "a pattern of inadequate care," including: failing to protect minors from harm; failing to create safe treatment environments; failing to adequately staff its facilities; failing to adequately train and supervise staff; failing to develop individual treatment plans; failing to develop proper discharge and aftercare plans; and failing to conduct effective monitoring.

d.   Between December 2010 and mid-June 2011, while Plaintiff was a patient at the hospital, approximately 100 violent incidents were documented, including "scores of sex assaults and physical attacks"[20]

e.   Hospital staff attempted to mislead the UIC expert team multiple times by attempting to keep reviewers from accessing information about incidents.

f.   The UIC report also stated that Hartgrove staff were repeatedly told by UHS (parent company) officials that anyone suspected of providing information to the UIC reviewers would be fired.

56.   DCFS stopped placing children at Hartgrove in June 2011 after seeing a preliminary draft of UIC's report.[21]

57.   Despite the report, UHS stated on behalf of Hartgrove that: "Despite the findings in the UIC report, Hartgrove is proud of its track record and has many more success stories to its credit than the negative ones highlighted in the report."[22]

58.   UHS has faced additional legal scrutiny from both state governments and the federal governments for decades.

59.   In 2008, the U.S. Department of Justice ("DOJ") investigated Riveredge Hospital, another UHS youth residential treatment in Cook County, Illinois, for fraudulent billing practices under Medicare and Medicaid. Specifically, the DOJ alleged that UHS' psychiatric hospitals illegally admitted as many patients to their facilities for as long as possible, even if the patients did not need continued treatment or were not receiving adequate care. The DOJ alleged that this

---

[20] Roseanne Tellez, *Report slams conditions at West Side psychiatric hospital*, CBS Chicago (Sept. 28, 2011 5:58 PM), https://www.cbsnews.com/chicago/news/report-slams-conditions-at-west-side-psychiatric-hospital/ (last visited Aug. 5, 2025).
[21] *Id.*
[22] *Id*.

practice fraudulently increased Medicare and Medicaid reimbursements, which accounted for at least one third of the institution's revenue.

60.     Per the UIC report, UHS' business model encourages "deliberate and chronic understaffing" to curb costs.[23]

61.     In 2012, UHS settled False Claims Act allegations with the state of California for $4.25 million. The allegations included that employees at the facility were not appropriately credentialed and that children were "'warehouse[d]' as opposed to receiving adequate care."

62.     Another U.S. Department of Justice investigation revealed dozens of examples of sexual abuse in UHS facilities across the country, with investigations into some facilities finding that over 10 percent of patients had been sexually abused.

63.     Around July 2019, UHS, Inc. reached an agreement in principle with the DOJ's Civil Division and several states' attorney general offices to resolve the civil aspects of this investigation for $127 million. On July 6, 2020, UHS, Inc. entered a settlement agreement with the federal government.

64.     The settlement agreement reached with the DOJ was the culmination of a decade-long investigation into UHS, Inc., UHS-D, and other UHS facilities, including Hartgrove. The DOJ contended that the UHS corporate system:

    a.  Submitted or caused to be submitted false claims for inpatient behavioral health services provided to government agencies;

    b.  Admitted patients who were not eligible for inpatient or residential treatment;

    c.  Failed to properly discharge patients when they no longer needed inpatient or residential treatment;

---

[23] *Id.*

d.  Billed for services not rendered;

e.  Failed to adequately train or supervise staff, as well as failed to provide adequate staffing levels;

f.  Improperly used physical or chemical restraints and seclusion; and

g.  Failed to provide inpatient acute or residential care in accordance with state and federal regulations, including (but not limited to) inadequate assessments and treatment plans, inadequate discharge, and failure to provide required forms of therapy.

65.    A Senate Finance Committee Report investigated allegations of abuse and neglect at Residential Treatment Facilities (RTFs), including UHS facilities, finding that they are frequently "warehouses of neglect."[24] The report found that children suffer routine sexual abuse inside RTFs, including many UHS facilities, and that the risk of harm to children is "endemic to the operating model" of RTFs due to the incentives to optimize revenues and profit margin at the expense of patient care.[25]

66.    For children who were abused at Hartgrove, it was almost impossible to get help or stop the abuse. Children who did report were disbelieved, or worse, retaliated against, exacerbating and amplifying the trauma of the actual abuse. Children were reportedly punished for reporting abuse.

67.    Between 2006 and 2016, facilities owned or operated by UHS were either cited or investigated for inadequate staffing violations approximately ninety (90) different times.

---

[24] *Warehouses of Neglect: How Taxpayers are Funding Systemic Abuse in Youth Residential Treatment Facilities*, Senate Committee on Finance, https://www.finance.senate.gov/imo/media/doc/rtf_report_warehouses_of_neglect.pdf (last visited July 25, 2025)

[25] *Id*. (last visited July 25, 2025)

68.     At all relevant times, Defendants knew that failure to provide adequate staffing and supervision increased the threat of violence to patients such as Plaintiff.

69.     Despite Defendant's awareness of decades of systematic sexual and physical abuse of children in its care, UHS has failed to enact appropriate uniform national and system-wide protocols and policies to ensure the safety of its youth. Hartgrove acted with extreme disregard for the wellbeing of children in its programs by failing to properly screen, hire, and train employees, failing to report known abuse of youth in Hartgrove facilities, and ignoring and covering up complaints alleged against it regarding child abuse.

70.     UHS and Hartgrove's lack of and/or failure to enforce adequate policies and procedures for the prevention of, and proper response to, abuse of its patients, exacerbates and amplifies the trauma of the actual abuse due to institutional betrayal.

71.     The term "Institutional Betrayal" refers to wrongdoings perpetrated by an institution upon individuals dependent on that institution, including failure to prevent or respond supportively to wrongdoings by individuals (e.g., physical, emotional, and sexual abuse) committed within the context of the institution.[26]

72.     The failures, acts, and egregious omissions by staff at Hartgrove created a highly dangerous risk of physical, emotional, and sexual abuse for any child placed at Hartgrove. The pervasive culture of abuse allowed perpetrators access and opportunity to abuse highly vulnerable children and young adults and gave them impunity to act without the risk of detection or punishment.

---

[26] Jennifer J. Freyd, *Institutional Betrayal and Institutional Courage*, https://dynamic.uoregon.edu/jjf/institutionalbetrayal/ (last visited Aug. 5, 2025); *see also* Carly Parnitzke Smith & Jennifer J. Freyd, *Institutional Betrayal*, 69 AM. PSYCH. ASSOC. 575 (2014) (available at: https://pages.uoregon.edu/dynamic/jjf/articles/sf2014.pdf (last visited Aug. 5, 2025)).

73.     Children like Plaintiff arrive at Hartgrove seeking treatment, healing, and belonging. For decades, Hartgrove has abused the trust that families have placed in it by allowing a culture of abuse, exploitation, and trauma—one that led to severe emotional consequences for Plaintiff.

**Plaintiff was Repeatedly Abused at Hartgrove**

74.     Plaintiff was approximately 14–16 years old when she was sexually, physically, and emotionally abused by Hartgrove staff members over the course of three residential stays.

75.     Plaintiff was admitted to Hartgrove Hospital three times, each visit lasting roughly one month, with approximately one month between visits. She believes these were inpatient stays arranged by her mother and her school.

76.     During these hospitalizations, Plaintiff experienced several episodes of abuse. On her first visit, three such episodes occurred:

  a.  A Caucasian male staff member repeatedly forced female patients, including Plaintiff, to kiss one another while he laughed. The staff member acted with the intent and knowledge that his behavior would cause unwanted physical contact between the girls.

  b.  Plaintiff's underwear disappeared multiple times, and she believes it was stolen by the same male staff member.

  c.  The same male staff member routinely had inappropriate conversations with female patients and would demonstrate favoritism by providing girls who accepted his advances with food and other privileges.

77.   During Plaintiff's second admission at Hartgrove, the same male staff member tried to coerce her into spending time alone with him. When she refused, he attempted to extend her stay by speaking ill of her to other staff members.

78.   The third time Plaintiff was admitted to Hartgrove, a male, African American "teacher" forced Plaintiff to touch another student inappropriately. The teacher mocked and laughed at her.

79.   Upon information and belief, Plaintiff was participating in Hartgrove's state- and federally-funded educational services during this incident.

80.   For years, Plaintiff lived alone with guilt and shame about the above events. Her aunt, with whom she shared a close bond and who picked her up from Hartgrove, recalls sensing that something was wrong when she picked Plaintiff up from Hartgrove. Although Plaintiff was typically outgoing and joyful, she became withdrawn and appeared deeply sad, and frequently experienced emotional breakdowns and crying fits, which continued over time.

81.   Plaintiff seeks damages for the ongoing trauma she has faced because of her experiences at Hartgrove. The trauma from these incidents has significantly altered her ability to experience intimacy and physical affection, causing strain in her marriage.

82.   Plaintiff's relationship with her mother is also strained, because Plaintiff feels too ashamed to recount the above experiences to her.

83.   Hartgrove represented that it would provide children like Plaintiff with a safe environment in which they could heal and learn—an obligation it failed to fulfill due to negligent hiring and retention practices, failure to oversee rampant problems within the workplace, and prioritizing profit over patients.

84. The amount in controversy exceeds $75,000 when accounting for the emotional, educational, and physical damages sustained by Plaintiff.

**VICARIOUS LIABILITY**

85. Hartgrove is vicariously liable for the tortious conduct described herein by employing staff who mistreated and abused Plaintiff.

86. When Plaintiff was physically and emotionally mistreated by Hartgrove staff members, these staff members were acting within their scope of employment by Hartgrove and UHS because they were entrusted to provide treatment yet employed medically improper, harmful techniques against Plaintiff.

87. Hartgrove staff members used their positions as employees of Hartgrove/UHS to enable mistreatment, including abuse, of Plaintiff, such that Hartgrove and UHS are vicariously liable for their conduct.

88. Staff members at Hartgrove are charged with the care of children with emotional and/or intellectual disabilities and entrusted to keep them safe. But for their employment at Hartgrove, staff members would not have been in unsupervised situations with young and vulnerable victims such as Plaintiff. Additionally, the responsibilities associated with staff members' employment enabled them to exert excessive and abusive authorities over victims, including Plaintiff.

89. Staff members took advantage of the authority associated with their responsibilities at Hartgrove to place Plaintiff in abusive and compromising situations.

90. Staff members' abuse of Plaintiff constitutes assaults or batteries, as detailed further below.

91. Hartgrove and UHS endorsed, encouraged, and ratified its staff members' abusive conduct toward Plaintiff by failing to discipline, take corrective action, and/or report child abuse. As noted by the UIC report, UHS has sanctioned this culture of abusive behavior by its staff and threatened people who report misconduct.

92. These tortious acts were also foreseeable, as Hartgrove was on notice during the years of 2010 to 2011 that incidents of sexual, physical and emotional abuse were rampant within its facility. The UIC report documented over 100 such cases during this time. These repeated instances of abuse alerted or should have alerted Hartgrove and UHS that staff members may be abusing patients and students.

93. In addition to the long, repeated history of abuse by staff members, Hartgrove knew that its patients, including Plaintiff, were particularly susceptible to mistreatment as youth with disabilities and critical mental health needs. Hartgrove/UHS knew, or reasonably should have known, that by failing to implement appropriate procedures, policies, and safeguards, it was highly foreseeable that staff would continue to abuse vulnerable children in its treatment programs, including Plaintiff.

94. UHS, Inc. and UHS-D, at all relevant times, has asserted authority and direction over Hartgrove, such that Hartgrove was an agent of UHS.

95. Throughout state and federal investigations into its facilities, UHS has regularly acted on behalf of its facilities.

96. As a direct and proximate result of UHS/Hartgrove's employees' abuse toward Plaintiff, she has suffered physical harms and has suffered and will continue to suffer physical and emotional pain and distress. UHC is vicariously liable for the intentional harms described herein.

## CAUSES OF ACTION

### COUNT I

**Violation of Title IX (20 U.S.C. §§ 1681, *et seq.*)**
**Sexual Harassment**
**(against all Defendants)**

97.     Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

98.     Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681(a), states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance. . . ."

99.     Title IX is implemented through the U.S. Department of Education ("DOE") regulations, which apply to "every recipient [of Federal financial assistance] and to all sex discrimination occurring under a recipient's education program or activity in the United States," 34 C.F.R. § 106.11, and which cover sexual harassment—including sexual assault—by school employees, students, and third parties.

100.    Federal DOE regulations further provide that recipients of federal financial assistance shall investigate complaints of noncompliance with those regulations, 34 C.F.R. § 106.8(a), which include sexual assault, sexual abuse, and sexual harassment.

101.    DOE regulations further require that recipients of federal financial assistance shall "adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints of harassment." 34 C.F.R. § 106.8(b).

102.    Plaintiff is a "person" under Title IX.

103.    Education is a pivotal part of the services Hartgrove provides to patients and residents, placing students at Hartgrove squarely under the protections of Title IX.

22

a.  Hartgrove's programs and facilities consist of educational programs by "fully integrat[ing] Hartgrove Academy's educational programs into [its] treatment plan."[27]

b.  Hartgrove receives federal and state special education funding from referring districts to reimburse it for its provision of educational services and behavioral interventions.

c.  Hartgrove partners with at least 7 local schools to provide counseling services, thereby receiving more federal and state educational funding.[28]

104.    Upon information and belief, Hartgrove receives federal financial assistance for its education programs via both Medicaid reimbursement for educational services provided and special education funding and therefore is subject to the provisions of Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681, *et seq.*, and its implementing regulations at 34 C.F.R. §§ 106.1, *et seq.*

105.    Under Title IX, Hartgrove was required to promptly investigate and address allegations, reports, and complaints of sexual harassment, assault, and abuse of youth in its programs.

106.    While Plaintiff was abused at Hartgrove, Hartgrove had actual knowledge of both prior and ongoing sexual abuse, harassment, and assault of youth in its facilities, including an ongoing investigation by UIC.

107.    Based on these ongoing incidents of sexual abuse and assault and Hartgrove's knowledge of its own failure to have, implement, and/or enforce proper policies to prevent and/or

---

[27] *Inpatient Services*, Hartgrove Behavioral Health System, https://hartgrovehospital.com/our-programs/inpatient-services/ (last visited July 28, 2025).
[28] *Schoolhouse Counseling Center*, Hartgrove Behavioral Health System, https://hartgrovehospital.com/schoolhousecc/ (last visited July 28, 2025).

respond to incidents of sexual abuse and assault, Hartgrove had actual knowledge of the substantial, increased, above-societal baseline risk that Plaintiff would be sexually abused, harassed, or assaulted.

108. With this knowledge, Hartgrove had the authority—and obligation—to address the heightened risk of sexual abuse in its programs, and had the authority to take corrective measures, including by:

a. Implementing and enforcing best-practice policies and procedures for the prevention of, and proper response to, incidents of sexual abuse and harassment at its facilities;

b. Addressing children and families' prior reports of sexual abuse and encouraging youth to openly report sexual advances by staff members;

c. Thoroughly investigating and terminating the employment of staff members with known complaints of prior sexual abuse and harassment of youth;

d. Increasing the quality of staff supervision, particularly during vulnerable nighttime hours, and not allowing staff members to take youth on unsupervised outings where sexual abuse occurred;

e. Maintaining appropriate numbers of staff to ensure that there were no blind spots where abuse could go undetected; and

f. Improving Hartgrove's physical facilities to increase visibility such that no concealed areas remained where abuse could occur undetected.

109. Hartgrove's failure to address the substantial risk of sexual abuse in its programs and facilities, given prior and ongoing investigations about sexual abuse, and its failure to set

appropriate sex discrimination policy, was clearly unreasonable considering the known circumstances.

110.    Plaintiff was subject to sexual harassment, abuse, and assault by a teacher in Hartgrove's inpatient schooling program, including being forced to inappropriately touch another student during class while the teacher laughed.

111.    The sexual harassment, abuse, and assault experienced by Plaintiff at Hartgrove constitutes sex discrimination under Title IX. As explained in Title IX guidance issued by the U.S. Department of Education's Office for Civil Rights, sexual harassment, abuse, and assault of students is a form of sex discrimination covered by Title IX.

112.    Hartgrove was on actual notice of the conduct as described above but nonetheless failed to carry out its duties to investigate and take corrective action under Title IX. Hartgrove was on notice due to an ongoing investigation that its policies were inadequate to prevent sexual abuse.

113.    UHS and Hartgrove not only failed to act—they attempted to "cover up" acts of abuse and impede the ongoing investigation by instructing staff members not to give information to UIC investigators and otherwise keeping information from them.

114.    Hartgrove and UHS are, and have been, deliberately indifferent to the substantial risk of sexual abuse, assault, and molestation posed to all youth who enter its programs and treatment centers. After being subject to multiple federal and state investigations, Defendant ignored the sexual abuse occurring under its watch and allowed it to continue.

115.    Hartgrove is responsible for setting and approving all national, organization-wide policies and protocols for Hartgrove programs and operations, including sex discrimination policies.

116. Hartgrove failed to promptly investigate and address allegations, reports, and complaints of sexual harassment, assault, and abuse of youth in its programs—and indeed, attempted to cover them up. As a result of this deliberate indifference, Plaintiff was subjected to severe sexual abuse and faced a heightened risk of sexual abuse while a resident.

117. The heightened risk of sexual harassment, abuse, and assault experienced by Plaintiff at Hartgrove was so severe, pervasive and objectively offensive that it effectively barred her access to educational opportunities and benefits, including a safe educational environment, full access to treatment programs, and appropriate medical care while at Hartgrove. This is because abuse—and the constant risk and fear of it—physiologically rewires the brain in a way that impairs learning, development, communication, and growth.

118. Plaintiff, who was school-aged at the time of her abuse, relied on Hartgrove to receive her education. Being subjected to pervasive, repeated abuse, and a sustained threat of sexual assault denied Plaintiff the ability to benefit from those educational opportunities. The severe anxiety, trauma, fear, and suffering inflicted by Hartgrove hindered Plaintiff's ability to meaningfully participate in its classes and educational programs.

119. As a direct and proximate result of Hartgrove's actions and/or inactions, Plaintiff experienced damages.

120. Hartgrove was deliberately indifferent to a sexually hostile culture with a heightened risk of sexual harassment within its programs and facilities by, among other things:

   a. Failing to address children and families' reports of sexual abuse and/or discouraging youth from reporting such abuse;

   b. Failing to promptly and adequately investigate, remedy, and respond to complaints about sexual abuse at Hartgrove;

26

c.   Refusing to participate willingly in the UIC investigation into sexual assault and general treatment conditions at Hartgrove;

d.   Failing to adequately supervise staff members, particularly during vulnerable nighttime hours;

e.   Failing to maintain appropriate numbers of staff to ensure that there were no blind spots where abuse could go undetected.

121.   Hartgrove's creation of and deliberate indifference to a sexually hostile culture increased the risk that Plaintiff would be sexually harassed. By failing to set appropriate sex discrimination policies, this risk of sexual harassment was increased even further. Because Hartgrove failed to take corrective measures to curb the pattern and practice of sexual abuse towards its patients at Hartgrove, instead allowing this conduct to thrive, Plaintiff suffered emotional distress, great pain of mind and body, shock, embarrassment, humiliation, loss of self-esteem, and physical manifestations of this emotional distress.

122.   Plaintiff suffered sexual abuse that was so severe, pervasive, and objectively offensive that it denied her access to educational opportunities.

123.   In addition to compensatory damages, which are the direct and proximate result of Hartgrove's actions and/or inactions, Plaintiff requests the award of attorneys' fees pursuant to 42 U.S.C. § 1988(b).

## COUNT II

### Negligence
### (Against all Defendants)

124.   Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

125.   Hartgrove owed Plaintiff a duty to provide a safe environment with adequate protection, supervision, and care while in its custody.

126.     Hartgrove acted with a lack of care toward Plaintiff through its acts and omissions, including: allowing and authorizing a culture of abuse at Hartgrove; failing to train and educate staff regarding the identification of abuse; failing to adequately train staff regarding best practices when working with youth with advanced mental health needs; failing to adequately supervise staff members to proactively identify and curtail signs of abuse; failing to maintain Hartgrove staffing levels and facilities so as to eliminate "blind spots" where abuse could easily occur without detection; failing to instruct supervisors regarding circumstances indicating a high risk of abuse; failing to monitor Plaintiff's wellbeing while in Hartgrove programming so as to detect incidents of abuse; failing to take adequate and appropriate measures after learning about repeated known incidents of physical, sexual, and emotional abuse within Hartgrove programs; and failing to prevent serious and lasting psychological, physical, and emotional harm to youth in Hartgrove programs.

127.     Moreover, Hartgrove's attempts to "cover up" or prevent the reporting of abuse exacerbated and amplified the trauma of the actual abuse due to institutional betrayal.

128.     By failing to exercise ordinary care through its acts and omissions, Hartgrove foreseeably caused physical and emotional harm to Plaintiff.

## COUNT III

### Negligent Hiring
### (Against Defendants UHS and Hartgrove)

129.     Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

130.     Hartgrove is required to make an appropriate investigation of all employees staffed at its facilities. This duty requires that potential applicants are thoroughly and appropriately screened to ensure that they will provide safe care for the vulnerable children in Hartgrove's programs.

131.    Hartgrove knew or should have known that the employment of staff members who employed Plaintiff posed a risk or hazard to youth in its treatment programs. With a thorough background check and investigation of applicants' prior work history, personal, and professional references, and potential "red flags," Hartgrove would have known that these employees were not suitable for the duty of caring for children.

132.    It was unreasonable for Hartgrove to hire employees whom Hartgrove should have known, based on reasonable pre-hiring screening, were unsuitable to work in a behavioral health center for children and adolescents with cognitive differences and advanced mental health needs.

133.    Hartgrove, upon information and belief, struggles to find adequate staffing due to low wages and pressure to fill beds even while staff levels are inadequate.

134.    As detailed above, Plaintiff was harmed by multiple Hartgrove staff members, including sexual abuse, misconduct, physical assault, and withholding basic necessities.

135.    Because of Hartgrove's negligent hiring practices, Plaintiff was foreseeably harmed by these employees. Had Hartgrove shown due care in the screening of its employees, Hartgrove staff members would not have been given the access and opportunity to physically, sexually, or emotionally abuse Plaintiff.

**Count IV**

**Negligent Retention**
**(Against Defendants UHS and Hartgrove)**

136.    Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

137.    Hartgrove became aware or reasonably should have become aware that its employees were engaged in acts of physical, sexual, and/or emotional abuse of patients and residents, and yet it failed to investigate, discharge, or reassign these employees.

138.    Hartgrove reasonably should have known that, among other things, its staff: inappropriately restrained residents; inappropriately strip-searched residents; inappropriately placed residents in seclusion rooms; inappropriately and excessively medicated residents; withheld basic necessities from residents as punishment; groomed residents for sexual abuse; forced residents to perform sexual acts; sexually assaulted residents; physically assaulted residents; enabled physical assaults between residents; ignored residents' pleas for help; and retaliated against residents for reporting abuse.

139.    With reasonable supervision and protocols in place, Hartgrove would have known about each of these incidents. Even though Hartgrove reasonably should have known about this abuse, it allowed the abuse to occur and retained the employees responsible for these heinous acts without taking corrective action.

140.    Hartgrove reasonably should have known about the abuse of Plaintiff, especially incidents that happened in public areas like classrooms; however, Hartgrove negligently retained the employees responsible for the abuse. Because of Hartgrove's breach of its duty to take action to prevent reasonably foreseeable harm by its employees, Plaintiff was grievously harmed.

## Count V

### Negligent Supervision
**(Against Defendants UHS and Hartgrove)**

141.    Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

142.    Hartgrove owed a duty to exercise reasonable care in its operation of programs for youth with developmental or intellectual disabilities, behavioral needs, and mental health concerns, to avoid harm to the vulnerable youth in its custody. Hartgrove possessed a special relationship with Plaintiff, as Hartgrove was entrusted with the duty of care and custody over her, a minor at the time.

143.    Hartgrove knew or should have known that the lack of supervision of staff members who abused Plaintiff posed a risk or hazard to the youth in its treatment programs.

144.    Plaintiff could not have been reasonably expected to protect herself. No child is reasonably able to protect himself or herself from sexual, physical, and emotional assaults and abuses by staff who are tasked with their care. This is even more true for youth in Hartgrove's programs, who come to Hartgrove because of their need for advanced behavioral or mental health support. In many instances, mental health conditions and prior trauma may inhibit a child's ability to know or appreciate the nature of their relationships with others and understand appropriate versus inappropriate interactions with teachers or staff members.

145.    Hartgrove reasonably should have known that its staff were coercing residents into performing sexual acts, sexually abusing residents, and allowing resident-on-resident abuse.

146.    Hartgrove failed to exercise ordinary care to prevent intentional harms by its employees acting outside the scope of their employment. Hartgrove and UHS were aware that employees routinely committed acts of sexual, physical, and emotional abuse towards Hartgrove patients, students, and residents. This gave Hartgrove reason to know that abuse of its residents and patients was commonplace and that Hartgrove needed to implement procedures and practices to prevent intentional harms by Hartgrove staff.

147.    Hartgrove knew that it had the ability to control the conduct of its staff. UHS threatened repercussions for staff who reported abuse. Moreover, Hartgrove is in an employer-employee relationship in which Hartgrove sets standards, protocols, and policies for its staff, exercises a supervisory role over staff, and has the capacity to fire and reassign its employees.

148.    Despite knowing of a pattern and practice of abuse in Hartgrove programs, Hartgrove failed to enact and implement appropriate policies and protocols, including, for

example: sufficient staffing levels such that staff members were not alone with children, enacting supervision protocols to ensure that staff were following proper procedures, eliminating blind spots in Hartgrove facilities where abuse occurred undetected, and taking immediate action to investigate, reassign, and/or terminate employment for staff who engaged in abusive behavior toward patients and residents.

149.     Because of Hartgrove's negligent supervision in which Hartgrove and UHS breached their duty to exercise reasonable care to prevent outrageous and tragic harms to youth in their care, Plaintiff was gravely harmed.

## COUNT VI

### Gross Negligence
### (Against all Defendants)

150.     Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

151.     Hartgrove owed Plaintiff a duty to provide a safe environment with adequate protection, supervision, and care while in its custody.

152.     Hartgrove acted with a lack of care toward Plaintiff by demonstrating a conscious disregard or indifference toward her safety and wellbeing and significantly departing from how a reasonably careful person would act under the circumstances.

153.     At all relevant times, Hartgrove owed a duty to Plaintiff to implement practices and policies to, among other things:

a.      Prevent sexual, emotional, and physical abuse by its staff;

b.      Prohibit and prevent romantic or sexual relationships between youth and Hartgrove staff;

c.      Prohibit and prevent grooming and other sexually exploitative behavior by Hartgrove staff;

d. Require the prompt reporting of any allegations or suspicions of sexual, physical, or emotional abuse of youth in Hartgrove programs by staff or peers;

e. Require (and not impede) the independent investigation of all reports of sexual, physical, or emotional abuse of youth in Hartgrove programs;

f. Protect Plaintiff from abuse and foreseeable risks;

g. Provide a safe environment for children with disabilities and mental health needs free from sexual abuse, harassment, and physical harm.

154. Hartgrove's duty arose from taking responsibility for the care and custody of youth attending its programs.

155. Hartgrove acted recklessly and indifferently as the entity responsible for the care and custody of children with disabilities and advanced mental health needs who sought out Hartgrove for treatment, growth, and education, including Plaintiff.

156. Hartgrove knew or should have known that by failing to take appropriate measures with respect to the lack of appropriate training, supervision, and oversight of its facilities and employees who work closely with children and young adults with advanced mental health needs, Hartgrove created an unreasonable risk of harm to Plaintiff so great that it was highly probable that harm would result.

157. As one of the country's largest behavioral healthcare providers, Hartgrove is or should be acutely aware of the delicate nature of working with youth and the likelihood of abuse and harm resulting from the failure to closely monitor, train, and supervise its staff. Hartgrove thus owed its resident youth a duty to protect them from foreseeable risk of staff who take advantage of this power differential for improper purposes.

33

158.     The power differential here was extreme. Youth with disabilities are easily targeted because they are more likely to be perceived as weak or vulnerable and are seen as less likely to report abuse. Especially in a group home or residential treatment setting, abuse can be more easily hidden, and children may have limited access to police, advocates, family members, or social services representatives who can intervene.

159.     By recklessly failing to keep Plaintiff safe while in its care and custody, Hartgrove exhibited a willful disregard for necessary precautions to reasonably protect her.

160.     As a direct and proximate result of Hartgrove's reckless indifference to Plaintiff, she has suffered and continues to suffer from emotional pain and suffering, mental and emotional distress and suffering, physical manifestations of this distress, anxiety, fright, grief, humiliation, and loss of enjoyment of life. Plaintiff was prevented and will continue to be prevented from performing her activities of daily living due to the gross negligence of Hartgrove.

### Count VII

### Negligent Misrepresentations
**(Against all Defendants)**

161.     Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

162.     In the course of its business, Hartgrove and UHS present themselves as maintaining a gold standard in the field of behavioral treatment for youth with mental health needs. Hartgrove describes itself as taking a "comprehensive and compassionate approach to inpatient psychiatric treatment."[29] Hartgrove represents itself as a "place for hope and healing for almost 50 years."[30] Hartgrove is presented as "a fresh start toward a hopeful future."[31]

---

[29] https://hartgrovehospital.com/our-programs/inpatient-services/ (last visited Aug. 5, 2025).
[30] https://hartgrovehospital.com/about-us/our-history/ (last visited Aug. 5, 2025).
[31] https://hartgrovehospital.com/ (last visited Aug. 5, 2025).

163.     Hartgrove also touts Hartgrove Academy as a way for children to "maintain[]" their education while seeking treatment—as part of their recovery process. For all patients who are enrolled in school, Hartgrove notes that they "fully integrate[]" educational programs into their treatment plans.

164.     Through its advertising, Hartgrove represented to Plaintiff's mother that evidence-based practices and protocols were in place at its facility to ensure the safety of children placed in its care. What Hartgrove failed to mention, however, is the repeated pattern of sexual abuse and exploitation of young people who enter its programs.

165.     Hartgrove's advertising and website misrepresents material facts regarding the quality of its programs, as Hartgrove deprives students like Plaintiff of crucial educational opportunities and negligently supervises and manages its facilities in such a way that children such as Plaintiff routinely suffer sexual, physical, and emotional abuse while under its watch.

166.     Plaintiff's mother relied on Hartgrove's representations about the quality of its programs in choosing Hartgrove for treatment.

167.     Hartgrove knew or should have known that the representations about the quality of its programs—especially regarding the safety and security of its patients, students, and residents—would be relied upon by individuals and families.

168.     Plaintiff was harmed because of Hartgrove's negligent misrepresentations about the safety and security of its programs. Her guardian reasonably relied on Hartgrove's representations of safety and security and were thereby harmed when they unknowingly placed Plaintiff in Hartgrove's custody.

## Count VIII

### Illinois Gender Violence Act
### (Against Defendants UHS and Hartgrove)

169.    Plaintiff incorporates all preceding paragraphs as if set forth in full herein.

170.    A corporation may be subject to liability under the Illinois Gender Violence Act for the actions committed by its agents and employees. 740 ILCS 82.

171.    At all relevant times, Plaintiff's abusers were employees of Defendants Hartgrove, UHS, and UHS-D.

172.    A person or entity perpetrates gender-related violence under Illinois law by "personally committing the gender-related violence or personally encouraging or assisting the act or acts of gender-related violence." 740 ILCS 82/10.

173.    If a company knows or should have known that an employee is a risk to patients but takes no action, they may be personally liable under the Illinois Gender Act. *Gasic v. Marquette Mgmt.*, 2019 IL App (3d) 170756 (Ill. Ct. App. 2019).

174.    At all relevant times, Defendants encouraged or assisted gender-based violence against Plaintiff by taking the following actions, each of which emboldened sexual abusers to view UHS facilities as a safe haven for sexual predators:

a.    Providing facilities for employees to sexually abuse vulnerable patients;

b.    Making public statements to the media, state, and federal governments defending their employees who were accused of sexual abuse, representing sexual abuse as a rare occurrence;

c.    Undermining investigations into the extent of sexual misconduct perpetuated by employees by threatening employees who spoke out and seeking to hide evidence from UIC investigators;

d.  Creating, promoting, and following policies that expressly directed employees to fill more beds, even when UHS knew that doing so would exacerbate existing problems with sexual abuse by staff members.

175.  As a direct result of Hartgrove's actions and omissions, predators such as the staff members who abused Plaintiff were emboldened. By creating an environment in which sexual abuse went unchecked, Hartgrove encouraged or assisted the acts of gender-related violence.

176.  Plaintiff's injuries were directly and proximately caused by Hartgrove's acts that encouraged abusers, such as hers. She has suffered and continues to suffer severe emotional and physical harm.

177.  Plaintiff seeks punitive damages and attorneys' fees and costs in accordance with 740 ILCS 82/15.

## Count IX

### Assault and Battery Through Vicarious Liability
**(Against all Defendants)**

178.  Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

179.  Hartgrove staff members, who are charged with patients' safety and wellbeing, used their power and authority in their roles to abuse Plaintiff.

180.  While Plaintiff resided at Hartgrove Hospital, she was abused by two different staff members on several occasions. The first forced her to kiss other residents, while the latter forced her to touch another patient inappropriately in front of a classroom full of students.

181.  Plaintiff did not and could not consent to these grievous harms and abuses.

182.  These acts were intentional, unwanted, and offensive physical contacts and/or non-consensual sexual acts towards a minor which constitute assault and battery for which Hartgrove is vicariously liable.

37

183.    Civil battery in Illinois occurs when "contact by a defendant that is unauthorized. . . where defendant has done some affirmative act intended to cause the unpermitted conduct." *Battle v. Chicago Police Officers, et al.*, 1:11-cv-01138 (N.D. Ill. Oct. 30, 2012).

184.    Hartgrove is vicariously liable for assault and battery perpetrated on Plaintiff by its staff because ensuring that Plaintiff was not sexually abused or coerced into sexual activities falls within the scope of the staff members' employment.

185.    Further, Hartgrove is vicariously liable for assault and battery perpetrated on Plaintiff by its staff because Hartgrove employed the staff, who were acting within the scope of employment.

186.    As a result of the assault and battery against Plaintiff, for which Hartgrove is vicariously liable, Plaintiff has suffered emotional and physical harms that continue to affect her life today and will continue to cause Plaintiff pain and suffering for the rest of her life.

## Count X

### Negligent Infliction of Emotional Distress
**(Against all Defendants)**

187.    Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

188.    Hartgrove's negligent acts and omissions constitute the negligent infliction of emotional distress.

189.    Hartgrove acted negligently toward Plaintiff, as described above.

190.    This negligent conduct created an unreasonable risk of physical harm, which caused Plaintiff to fear for her safety each time she was admitted to Hartgrove.

191.    Plaintiff suffered emotional distress because of Hartgrove's negligent conduct. This resulted in physical consequences and/or long-continued emotional disturbance, as described above.

192.     Hartgrove's conduct was the foreseeable cause of these damages.

193.     Moreover, Hartgrove's lack of and/or failure to enforce adequate policies and procedures for the prevention of, and proper response to, abuse of its patients exacerbates and amplifies the trauma of the actual abuse due to institutional betrayal.

**Count XI**

**Intentional Infliction of Emotional Distress**
**(Against all Defendants)**

194.     Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

195.     Hartgrove's actions and inactions were outrageous and extreme, shocking, atrocious, and intolerable. Its conduct goes beyond the possible bounds of decency, and Hartgrove acted with the reckless disregard of the possibility Plaintiff would suffer emotional distress as a result.

196.     Hartgrove's conduct was a substantial factor in causing severe emotional and psychological distress to Plaintiff. The distress from being forced into sexual activity by employees of Hartgrove acting in their official capacity was of such an intensity that no reasonable person should be expected to endure it.

197.     Moreover, Hartgrove's lack of and/or failure to enforce adequate policies and procedures for the prevention of, and proper response to, abuse of its patients exacerbates and amplifies the trauma of the actional abuse due to institutional betrayal.

198.     By sanctioning a culture of systematic physical, emotional, and sexual abuse at Hartgrove facilities, Hartgrove caused Plaintiff to suffer, among other things, appalling and deplorable acts of physical, sexual, and emotional abuse, and the resulting pain, suffering, humiliation, grief, shame, disgust, anxiety, nervousness, shock, distrust, and loss of enjoyment of

life. Plaintiff will continue to suffer from these enduring harms and will incur more expenses for psychological treatments and counseling.

### Count XII

### Breach of Fiduciary Duty
**(Against All Defendants)**

199.    Plaintiff incorporates by reference all prior paragraphs as if set forth in full herein.

200.    Hartgrove, a service provider for children and adolescents suffering from acute mental health needs, owes a fiduciary duty to act in the best interest of the youth it serves. When a child is placed at Hartgrove or any UHS facility, Hartgrove assumes the fiduciary duty to ensure that the child receives appropriate care and is safe from foreseeable harms.

201.    By sanctioning a culture of physical, emotional, and sexual abuse in its facility, allowing youth to be systematically abused, inadequately training and supervising Direct Support Professionals, failing to maintain safe staffing levels, and failing to monitor Plaintiff's wellbeing so as to detect signs of abuse, among other failures, acts, and omissions as previously described, Hartgrove has breached its fiduciary duty towards Plaintiff.

202.    Plaintiff has suffered emotionally, physically, and financially as the result of this breach of fiduciary duty.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter a judgment on her behalf and against UHS and Hartgrove, and further grant the following relief:

A.    Award Plaintiff compensatory damages, punitive damages, pain and suffering, and any other relief to which they are entitled under the law;

B.    Award Plaintiff prejudgment interest, costs and attorneys' fees; and

C.     Award to the Plaintiff such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury as to all matters so triable.

Dated: August 6, 2025                              Respectfully submitted,

**FEGAN SCOTT LLC**

By: */s/ Elizabeth A. Fegan*
Elizabeth A. Fegan
**FEGAN SCOTT LLC**
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Joseph G. Sauder (to be admitted *pro hac vice*)
Joseph B. Kenney (to be admitted *pro hac vice*)
Heather A. Swadley (to be admitted *pro hac vice*)
**SAUDER SCHELKOPF LLC**
1109 Lancaster Avenue
Berwyn, PA 19312
Telephone: (888) 711-9975
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
jbk@sstriallawyers.com
has@sstriallawyers.com